UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| KELLY R. STANTON, | ) | |
| (Social Security No. XXX-XX-8322), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:06-cv-121-RLY-WGH |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM DECISION AND ORDER**

**I. Statement of the Case**

Plaintiff, Kelly R. Stanton, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. § 404.1520(f). The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on April 14, 2003, alleging disability since July 13, 2002. (R. 51-53). The agency denied Plaintiff's application both initially and on

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue, in his official capacity only, is substituted as the Defendant in this action.

reconsideration. (R. 27-33, 35-36). Plaintiff appeared and testified at a hearing before Administrative Law Judge Marsha Stroup ("ALJ") on December 8, 2004. (R. 161-95). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 161). On March 18, 2005, the ALJ issued her opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 14-24). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 3-5). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on July 12, 2006, seeking judicial review of the ALJ's decision.[2]

## II. Medical Evidence

In April 2003, Plaintiff presented at the emergency room with complaints of back pain and left lower extremity pain. (R. 108-09). The attending physician diagnosed left lower extremity pain and prescribed Neurontin and Darvocet. (R. 110).

Plaintiff underwent a physical therapy evaluation later in April 2003, as referred by her physician, Neil Probst, D.O. (R. 112). The therapist noted that Plaintiff's problems began six months earlier when she was pregnant. (R. 112). Plaintiff reported gaining 65 pounds during her pregnancy and stated that, since the baby's birth, she had burning pain across her mid back bilaterally. (R. 112). Plaintiff reported being unable to lift more than ten pounds. (R. 112). In terms of range of motion and strength testing,

---

[2]Normally, Plaintiff's Complaint would be denied, as it was not timely filed. However, the Appeals Council granted Plaintiff additional time to seek judicial review.

Plaintiff's upper and lower extremity and trunk range-of-motion were each within functional limits. (R. 112). She also exhibited normal bilateral lower extremity and right upper extremity strength. (R. 112). Plaintiff showed limited (4/5) left upper extremity strength and abdominal strength (3/5). (R. 112).

Plaintiff underwent treatment with a nurse practitioner between February and May 2003. (R. 114-22). Plaintiff reported a history of anxiety attacks that were treated with Paxil and Xanax; she claimed in February 2003 that her panic attacks had "greatly improved." (R. 121-22). On examination, the nurse practitioner noted limited flexion and rotation at the waist. (R. 122). Straight leg raising was negative. (R. 121). Plaintiff exhibited reduced upper and lower extremity strength. (R. 121). She had full range of motion in both knees with crepitus. (R. 121). The nurse practitioner's impression was scoliosis, near syncope, and degenerative joint disease in the knees. (R. 121). Later, she added back pain to the diagnostic impression. (R. 120).

In March 2003, Plaintiff was prescribed Neurontin. (R. 121). The nurse practitioner observed that Plaintiff's left shoulder blade was higher and more prominent than the right and that her right hip was slightly higher than the left one. (R. 120). A radiology report dated March 2003 showed very mild dextroscoliosis of the lower thoracic spine with no definite vertebral anomaly. (R. 119).

In April 2003, Plaintiff reported sporadic anterior leg pain that worsened with exertion, and back muscle spasms that she claimed prevented her from sitting or walking for any length of time. (R. 118). The nurse practitioner noted that Plaintiff lacked

sensation from her ankles to her knees in the anterior and lateral aspects of her legs. (R. 118). The nurse practitioner stated a diagnostic impression of lower extremity parasthesias bilaterally due to post partum. (R. 118).

In May 2003, Plaintiff reported having up to four headaches a day. (R. 115). Over-the-counter medication no longer relieved them. (R. 115). Plaintiff's back pain was better overall. (R. 115).

In August 2003, at the request of the state agency, Plaintiff underwent a neuro-psychological consultation with Jeffrey W. Gray, Ph.D. (R. 123-27). Dr. Gray noted that Plaintiff was appropriately dressed and groomed with no evidence of personal hygiene neglect. (R. 123). Her affect was normal and stable, and she was pleasant and friendly. (R. 123, 124). She was oriented to person, place and time. (R. 124). Plaintiff denied having auditory, visual, tactile, olfactory or gustatory hallucinations. (R. 124). Dr. Gray observed no clear signs of anxiety. (R. 124). Attention span and concentration were within normal limits. (R. 124). Verbal expression was normal, and Plaintiff comprehended procedural instructions with little repetition requested. (R. 124). Dr. Gray opined based on the mental status examination that Plaintiff had average to low average intellectual functioning. (R. 124). Dr. Gray stated that no data indicated decline in intellectual function due to depression or anxiety. (R. 124). Plaintiff reported doing very few household chores or activities. (R. 125). She stated that she talked on the phone and saw family members three to four times a week at her home. (R. 125). Dr. Gray opined that Plaintiff's abilities to initiate social contacts with others, communicate clearly,

cooperate and appreciate others' feelings were normal. (R. 125). Dr. Gray also opined that Plaintiff could relate to co-workers and interact with supervisors. (R. 125). He concluded that she could do complex, detailed and simple, repetitive types of tasks, handle work stressors, and would be fairly reliable and independent, but would do better if working in a one-on-one rather than group setting, that did not involve constant dealings with the public. (R. 126).

In October 2003, Plaintiff underwent a consultative examination by Phillip S. Budzenski, M.D., at the state agency's request. (R. 128). Plaintiff was taking Neurontin three times a day. (R. 128). She reported that heartburn, nausea, and vomiting were controlled with medications. (R. 129). She said she was able to perform basic activities of daily living. (R. 129). On examination, Plaintiff walked with a mildly antalgic gait favoring the left side. (R. 129). She was not unsteady, lurching or unpredictable. (R. 129). Plaintiff was stable at station and appeared comfortable in the seated and supine positions. (R. 129). She got on and off of the examination table without difficulty and could bend over to tie her shoes. (R. 129). Chest examination revealed moderate thoracic kyphosis. (R. 130). Musculoskeletal examination revealed no tenderness in the spinal process or paravertebral muscle spasm. (R. 130).

Plaintiff exhibited limited flexion and extension in the cervical spine. (R. 130). Forward flexion of the lumbosacral spine was normal to 90 degrees. (R. 130). She also exhibited normal straight leg raising. (R. 130). Shoulder, elbow and wrist examination revealed no crepitus, tenderness, erythema, warmth, swelling or nodules. (R. 130-31).

Examination of the knees revealed no crepitus, tenderness, effusion, laxity or nodules. (R. 131). Neurological examination indicated absence of light touch, pinprick and vibration sensation in the left leg from just below the knee cap to the toes. (R. 131). There were no other deficiencies noted. (R. 131). Plaintiff was able to walk on toes, heels and perform tandem walking. (R. 132). She could stand on either leg alone, and could perform a squat maneuver. (R. 132). Dr. Budzenski stated a diagnostic impression of moderate thoracic kyphosis, chest wall deformity, tension headaches by description, and history of depression. (R. 132). He opined that Plaintiff could work eight hours a day in a seated position; stand for 15 minutes each hour; ambulate sufficiently to get to and from her workplace; grasp, push, pull and manipulate up to ten pounds continuously and up to 20 pounds occasionally. (R. 132). He further opined that she could operate only fairly simple foot controls with the left lower extremity. (R. 132). He concluded that Plaintiff should avoid crawling, climbing or working around unprotected heights. (R. 132).

Plaintiff was treated by Dr. Probst and Dr. Wood between September 2003 and October 2004. (R. 141-53). In September 2003, Dr. Probst diagnosed anxiety with panic disorder, ongoing back pain, and ringworm. (R. 146-47). Plaintiff reported that her back and knee pain was "quite stable" since she began taking Celebrex. (R. 147). She had tenderness throughout the lower back but negative straight leg raising. (R. 147). She was told to restart Valium, which she had stopped taking. (R. 146).

In October 2003, Dr. Probst noted that Plaintiff was taking Valium, Flexeril and

6

Ultram. (R. 146). He instructed Plaintiff to stop taking Flexeril for back pain. (R. 146). Plaintiff reported that her disability claim had been denied. (R. 146). Dr. Probst stated: "I do think she could find employment. She would need something such as possibly a file clerk which she would be able to move around quite a bit as I don't think that either standing for long periods of time or sitting for long periods of time would be in her best interest." (R. 146). Dr. Probst also filled out a functional capacity assessment form in which he opined that Plaintiff would need four days a month off of work to cope with her impairment. (R. 136).

In January 2004, Plaintiff reported knee pain; Dr. Probst noted slight crepitus on the right side. (R. 145). He encouraged her to continue doing stretches for the back and to stop taking Ultram if it was not helping. (R. 145).

In April 2004, Dr. Wood reported that Plaintiff's back pain was fairly stable. (R. 144). Plaintiff had discontinued taking Ultram but then "decided that it was really helping after all," so she resumed taking it. (R. 144). Plaintiff reported that she was only taking the Celebrex infrequently even though it helped with the discomfort. (R. 144). On examination, Plaintiff was smiling and alert; she easily got on and off of the examination table from a supine position. (R. 144). She had no tenderness in the back and exhibited straight leg raising. (R. 144). She had equal strength in the lower extremities. (R. 144). Dr. Wood encouraged her to take Celebrex daily and to depend less on Flexeril and Valium, so as to avoid chronic use. (R. 144).

In June 2004, Plaintiff reported that Celebrex was "not helping" the knee pain. (R.

143).  She stated that she had more right knee problems such as locking up and popping. (R. 143).  Knee x-rays did not reveal any significant bony changes.  (R. 143). On examination, Plaintiff had normal range of motion in the right knee.  (R. 143).  Dr. Wood noted mild tenderness but no crepitus or structural changes.  (R. 143).  His diagnostic impression was bilateral knee pain secondary to chondromalacia patella.  (R. 143).

In September 2004, Plaintiff requested a refill of Valium, which was denied since she had filled the prescription only five days earlier.  (R. 143).  At an examination by Dr. Wood, Plaintiff reported that her pain had "gone away for a while" but had returned.  (R. 142).  Dr. Wood noted significant kyphosis in the back but no areas of point tenderness. (R. 142).  He instructed her to restart Neurontin, as he did not feel that narcotic pain medications would be a good option for Plaintiff.  (R. 142).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this Court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment

for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).

Thus, even if reasonable minds could disagree about whether or not an individual was

"disabled," the Court must still affirm the ALJ's decision denying benefits.  *Schmidt v.

Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that

she suffers from a "disability" as defined by the Act.  "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of a medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential

five step test the ALJ is to perform in order to determine whether a claimant is disabled.

*See* 20 C.F.R. § 404.1520.  The ALJ must consider whether the claimant:  (1) is presently

employed; (2) has a severe impairment or combination of impairments; (3) has an

impairment that meets or equals an impairment listed in the regulations as being so severe

as to preclude substantial gainful activity; (4) is unable to perform his past relevant work;

and (5) is unable to perform any other work existing in significant numbers in the national

economy.  *Id.*  The burden of proof is on Plaintiff during steps one through four, and only

after Plaintiff has reached step five does the burden shift to the Commissioner.  *Clifford v.

Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

### V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through the date of her decision, and Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 23).  The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had three impairments that are classified as severe: scoliosis with referred pain to the lower extremities, recurring tension-type headaches, and bilateral knee pain.  (R. 23).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 23).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible.  (R. 23).  Consequently, the ALJ concluded that Plaintiff retained the RFC to:  (1) perform a limited range of sedentary work; (2) with no operation of foot pedals; (3) with hand work during only two-thirds of the workday and not constantly; and (3) with no pushing or pulling.  (R. 23).  The ALJ determined that Plaintiff could not perform her past work.  (R. 23).  The ALJ found that Plaintiff had no transferable skills.  (R. 24).  The ALJ opined that Plaintiff retained the RFC for a significant range of sedentary work and that Plaintiff could perform a significant number of jobs in the regional economy.  (R. 24).  The ALJ concluded by finding that Plaintiff was not under a disability.  (R. 24).

## VI.  Issues

The Court concludes that Plaintiff has essentially raised four issues.  The issues are as follows:

1. Whether remand is necessary for consideration of "new evidence."

2. Whether the ALJ improperly concluded that Plaintiff did not meet a listing.

3. Whether the ALJ's credibility determination was adequate.

4. Whether the ALJ's RFC assessment was proper.

**Issue 1:      Whether remand is necessary for consideration of "new evidence."**

Plaintiff's first argument is that she is entitled to remand based on new evidence. The Court may consider new evidence in some instances in order to determine if remand is warranted.  42 U.S.C. § 405(g).  Remand is warranted under sentence six of section 405(g) if Plaintiff can provide new evidence that is material and can demonstrate good cause for why the evidence was not submitted during the previous proceedings.  *Id*.  In order to demonstrate that the evidence is material, Plaintiff has the burden of showing a "reasonable probability that the Commissioner would have reached a different conclusion had [he] considered the evidence."  *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  Additionally, the evidence is new if it did not exist at the time of Plaintiff's hearing or was unavailable to her.  *Id*.

In this instance, plaintiff contends that an opinion from John O. Grimm, M.D., in a letter dated April 22, 2005, entitles her to remand.  Dr. Grimm stated in the April 22 letter that Plaintiff was unable to work because of a severe spinal deformity, that she suffered

from Scheuermann's thoracic hyperkyphosis which caused severe deformity of her chest and spine, that she had severe pain associated with this impairment, and that she would require surgery to correct the spinal deformity. (R. 154). This evidence qualifies as new evidence because it had not been rendered at the time of the ALJ's opinion, and Plaintiff had good cause for not providing it as she had previously been on a waiting list to see an orthopedist (R. 96), and the opinion from Dr. Grimm appears to be the result of that visit. This evidence is also clearly material. The opinion from Dr. Grimm was rendered only one month after the ALJ's decision about an impairment that does not appear to experience rapid degeneration. The opinion, therefore, pertains to the relevant time frame. The letter from Dr. Grimm is also material, given the severity of Dr. Grimm's prognosis, because there is a reasonable probability that the ALJ would have rendered a different opinion had this medical opinion been available.

The Court also notes that Dr. Probst opined that Plaintiff could not sit or stand for long periods at a time (R. 146), and that Plaintiff would need four days a month off of work to cope with her impairment (R. 136). The ALJ did not incorporate any of these opinions into her RFC finding and did not explain her rationale for failing to do so. Not only is Dr. Grimm's opinion material standing alone, but his opinion is also material in that the opinion of Dr. Probst is further bolstered by Dr. Grimm's dire assessment of plaintiff's impairment.

Because the opinion of Dr. Grimm is both new and material, Plaintiff is entitled to

remand. On remand the ALJ must address this opinion.³ The ALJ should also address the opinion of Dr. Probst concerning Plaintiff's RFC.

### Issues 2-4:     The Remaining Issues

Because remand is necessary to consider new evidence and to address that new evidence in conjunction with the opinion of Dr. Probst, the Court need not address the remaining issues.

### VII.  Conclusion

The final decision of the Commissioner is, therefore, **REMANDED** for the consideration of Dr. Grimm's opinion which qualifies as new evidence and Dr. Probst's opinion concerning Plaintiff's RFC.

**SO ORDERED** the 25th day of July 2007.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Eric Joseph Yocum
eric_yocum@msn.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

---

³It is likely that on remand the ALJ would be aided by recontacting Dr. Grimm to determine the medical support for Dr. Grimm's opinion.